# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Jose Cruz (B-73735), | ) |
|     Plaintiff, | ) |
|     v. | ) Case No. 17 C 0780 |
| | ) Judge Rebecca R. Pallmeyer |
| Ghaliah Obaisi, Independent Executor of the Estate of Saleh Obaisi, and LaTonya Williams, | ) |
|     Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Jose Cruz, a state prisoner, initiated this action under 42 U.S.C. § 1983, alleging that he received inadequate treatment for a hernia at the Stateville Correctional Center. The court recruited an attorney to represent Cruz in pursuing his Eighth Amendment claim, but recruited counsel withdrew, citing Cruz's refusal to cooperate effectively and courteously. Cruz now proceeds *pro se* in his claims against the two remaining Defendants: former Medical Director Dr. Saleh Obaisi, who is now deceased, and Physician's Assistant LaTonya Williams.[1] Both were employees of Wexford Health Services, which contracts with the state to provide medical services to Stateville prisoners. Defendants have moved to seal Cruz's medical records and for summary judgment in their favor. Defendants also object to the court's consideration of certain exhibits Cruz has submitted in opposition to the motion for summary judgment. For the reasons explained here, the objection is overruled. Defendants' motion for leave to file under seal is granted in part and denied in part; their motions for summary judgment are denied.

---

[1] Ghaliah Obaisi, Dr. Obaisi's Independent Executor, was substituted for Dr. Obaisi after the doctor's death on December 23, 2017 [63]. For clarity, the court will nevertheless refer to Dr. Obaisi.

## DISCUSSION

I.  **Objection to Consideration of Plaintiff's Exhibits**

Because Cruz is a *pro se* litigant, each Defendant served him with a Local Rule 56.2 "Notice to Pro Se Litigant Opposing Motion for Summary Judgment" explaining the requirements for responding to a motion for summary judgment and statement of material facts under Federal Rule of Civil Procedure 56 and Local Rule 56.1 [76,77]. Cruz largely followed the instructions in the notice: he replied to both Defendants' statements of undisputed material facts [92, 93], and he filed a memorandum in opposition to their motions for summary judgment [94]. He attached exhibits to his memorandum in opposition, as well as to his response to Dr. Obaisi's statement of facts [93, 94].

Among the exhibits he attached to his response to Dr. Obaisi's facts is an Illinois Department of Corrections "Medical Special Services Referral and Report" form. (Pl.'s Resp. to Obaisi's SOF [93] at 56.) Dr. Ozkezie[2] (Stateville's Acting Medical Director following Dr. Obaisi's death) completed the top portion of the form, stating that he referred Cruz for a surgical consult on August 15, 2018 due to a "large direct left inguinal hernia that is difficult to reduce." The bottom part of the form shows that a specialist (name illegible) who subsequently evaluated Cruz on October 29, 2018, found three hernias and recommended both laparoscopic and open surgery.[3] *See id.* Cruz asserts that he, in fact, underwent surgery on January 11, 2019 to repair all three hernias. (*See id.* at ¶ 23.)

---

[2]  Dr. Ozkezie is not a defendant in this case.

[3]  An inguinal hernia is a type of abdominal hernia; it occurs when a loop of the intestine protrudes through the inguinal canal (a short passage that extends inferiorly and medially through the inferior part of the abdominal wall). *Hernia*, DORLAND'S ONLINE MEDICAL DICTIONARY (32nd. ed. 2012), https://www.dorlands.com/dorlands/index.jsp. A hernia is reducible if it can be returned to its proper place by manipulation. *Id*.

Defendants ask the court to strike the "Medical Special Services Referral and Report," because Cruz did not submit his own statement of additional material facts and because he failed to respond to all of Defendants' statements of facts.[4] In Defendants' view, the Report may be considered only if it is presented as part of Cruz's opposition to Defendants' statements, which consist of a set of factual assertions as well as verbatim recitations of declarations from Defendant Williams and from Dr. Funk, Wexford's Northern Illinois Regional Medical Director, who offered his opinions on medical records maintained by Dr. Obaisi. Defendants also contend that Cruz improperly produced the report for the first time in opposition to summary judgment.

Defendants are correct that Cruz did not submit a statement of additional material facts pursuant to Local Rule 56.1(b)(2)(3). He also failed to respond to all of Defendants' facts. Specifically, while he responded to many of the factual assertions, he offered no response to the paragraphs that simply reproduce the declarations of Defendant Williams and Dr. Funk. Under a strict interpretation of the local rules, the facts that Cruz did not oppose could be deemed admitted. *See* Local Rule 56.1(b)(3)(C) ("All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party.").

The court has the authority to enforce its local rules, even against a *pro se* litigant, *McNeil v. United States*, 508 U.S. 106, 113 (1993), but the courts remain free to "exercise their discretion in a more lenient direction: litigants have no right to demand strict enforcement of local rules by district judges." *Modrowski v. Pigatto*, 712 F.3d 1166, 1169 (7th Cir. 2013) (citing *Stevo v. Frasor*, 662 F.3d 880, 887 (7th Cir. 2011)). *See also Gray v. Hardy*, 826 F.3d 1000, 1004-05 (7th Cir.

---

[4] Cruz attached several exhibits to his response to Dr. Obaisi's facts [93] and his opposition to the summary judgment motions [94]. Defendants ask the court to strike Exhibits 3 and 6-8. (Obaisi's Reply [95] at 1; Williams' Reply [96] at 1.) The "Medical Special Services Referral and Report" is Exhibit 3 to Cruz's response to Dr. Obasi's facts [93], and is the last exhibit in that response. Exhibits 6-8, which are attached to Cruz's response memorandum [94], include a sick call request to Dr. Obaisi dated December 14, a 2016 grievance against "Dr. Obaisi and other prison physicians" regarding his hernia, and a 2014 letter to Dr. Obaisi. Because Exhibits 6 through 8 do not affect the outcome of this opinion, the court will confine its attention to the "Medical Special Services Referral and Report."

2016) (holding that district courts are not required to hold *pro se* litigants to the potential consequences of their failure to comply with the Local Rules and can instead take "a more flexible approach," including ignoring the deficiencies in their filings and considering the evidence they submit); *Braddock v. United Parcel Serv.*, Inc., No. 1:14-CV-03839, 2017 WL 770973, at *1 n.2 (N.D. Ill. Feb. 28, 2017) (considering exhibits attached to a response to the movant's statements of fact that should have been submitted as a statement of additional facts.)

That flexible approach is warranted here. True, Cruz did not respond to all of Defendants' facts regarding his medical condition and interactions with P.A. Williams and Dr. Obaisi (perhaps assuming he did not need to oppose the facts that mirrored P.A. Williams' and Dr. Funk's declarations). His submissions and his deposition nevertheless make his position clear. The court declines to ignore Cruz's evidence and arguments due to a technical defect in form; the court is not required to "turn a blind eye" to facts presented in the record as a whole. *Farmer v. DirectSat USA, LLC*, No. 08-c-3962, 2010 WL 3927640, at *2 (N.D. Ill. Oct. 3, 2010) (quoting *Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995)); *see also Jobes v. Godinez*, No. 15-CV-4481, 2018 WL 3474532, at *2 (N.D. Ill. July 19, 2018) (exercising discretion to consider response and exhibits submitted by *pro se* prisoner in opposition to summary judgment because the prisoner identified "admissible evidence that contradicts Defendants' statements of fact, regardless of the formal deficiencies of Plaintiff's Local Rule 56.1 statements"). The court declines to deem facts admitted merely due to the lack of a formal response. *See Gray*, 826 F.3d at 1004-05.

Cruz's failure to submit his own statement of additional material facts is also not fatal. In his own statement of facts in support of summary judgment, Dr. Obaisi characterized Cruz's claim as "based on the fact that he has not seen a specialist for his hernia and that the hernia has not been surgically repaired." (Obaisi's SOF [87] ¶ 24.) Cruz responded that his claim against Dr. Obaisi was in fact based on Obaisi's failure to refer him to a specialist for surgery. (Pl.'s Resp. to Obaisi's SOF [93] ¶ 24.) Cruz acknowledged—as he arguably had to—that he has now "had

4

surgery and is recovering," but asserts that if Dr. Obaisi "had listened and examined [him]," he "would not have suffered as he did." (*Id*.) Cruz concludes the response by asserting that he "did not just have a belief that he needed surgery, it's a fact." (*Id*.) In this context, it was entirely appropriate for Cruz to support his response to Paragraph 24 with the "Medical Special Services Referral and Report."

Nor is the court moved by Defendants' contention that Cruz produced the "Medical Special Services Referral and Report" too late. (Obaisi's Reply [95] at 3-4; Williams' Reply [96] at 3-4.) Defendants argue that they had "no knowledge of the supposed surgery," multiple hernias, or the "Medical Special Services Referral and Report" until Cruz responded to the summary judgment motions. Defendants may have had no literal knowledge of Cruz's "supposed surgery," but there is no indication that Cruz withheld the information. At his deposition on August 2, 2018, while he was proceeding *pro se,* Cruz testified that in April 2018, the "new medical director" (Dr. Okezie) had "put [him] in for surgery." (Cruz Dep., Exhibit 2 to Pl.'s Resp. to Obaisi's SOF ("Cruz Dep.") [93] at 44:7-17.) Cruz clarified that he had been told that he was waiting for confirmation that he would proceed with hernia surgery, which would likely occur in January 2019 due to scheduling issues, if it was approved. (*Id.* at 45:5-18 (Q: "So you're currently scheduled for hernia surgery? A: "Yes, that's what he told me. But I don't know, you know, if I'm—I was told that I was approved, but I'm not sure if I'm approved or not. I'm waiting. They told me they're backed up all the way to January because having hernia surgeries and other procedures like that. So I don't really know. That's what I've been told by the nurses."); *id*. at 45:22-46:8 (a nurse told Cruz "a few times, two times, two or three times" that he had been approved for surgery); *id*. at 46:23-47:6 ("He just— He [Dr. Okezie] just checked me. I told him about it, and he just—we went into the—put a curtain up, and, you know, he checked me, and he said, I'm putting you in. That's it.").) In addition, in response to a question asking if Cruz had "ever asked for any paperwork indicating that [he was] approved for surgery," Cruz disclosed that he had requested updated medical records, stating, "I put in the paperwork so I can get a copy of my medical record from August 2017 until that point .

5

. . so I can see my medical records, what they say, but I haven't gotten them, it's been over four weeks, and I haven't gotten my medical records." (*Id*. at 46:13-18.)

It appears that Cruz was ultimately successful in obtaining his medical records. In addition to what was described earlier, the records[5] also include a note from Dr. Constance Marks (a specialist who treated a separate prostate condition) memorializing an office visit on February 18, 2016. Exhibit 5 to Pl.'s Resp. Memorandum [94].) Dr. Marks diagnosed Cruz with a "large" inguinal hernia, "nontender but unable to fully reduce" and stated that her urology practice "does not treat hernias, but once he's undergone prostate biopsy, we can discuss referral/management of that as well." (*Id*.)

Thus, despite P.A. Williams' and Dr. Obasi's positions that Cruz had never been diagnosed with a nonreducible hernia, evidence shows that at least as of February 2016, a urologist believed he had a large hernia that was not fully reducible. And as of August 2, 2018, when Cruz was deposed, Defendants were on notice that Dr. Okezie had told Cruz that he was a candidate for hernia surgery; that Cruz had discussed this subject with multiple nurses; that he had been told that if approved, his hernia surgery would likely be in January 2019; and that he was trying to get supporting medical records but was having trouble doing so. Yet defense counsel, who presumably had an obvious motivation to monitor treatment of the medical condition alleged in this lawsuit, nevertheless reported during an August 23, 2018 telephone status conference that she needed no further discovery [67]. Cruz could (and perhaps should) have supplemented the disclosures his lawyer had provided before she withdrew, *see* FED. R. CIV. P.

---

[5] Defendants have moved for leave to file Cruz's medical records under seal. The motion is granted in part: Defendants are directed to file the medical records under seal, but file, in the public record, a set of medical records from which personal identifying information and records of treatment unrelated to Cruz's hernia have been redacted. Records relating to Cruz's hernia history and treatment should be part of the unsealed record. *See Goesel v. Boley Int'l (H.K.) Ltd.*, 738 F.3d 831, 833 (7th Cir. 2013) ("Documents that affect the disposition of federal litigation are presumptively open to public view.") (quoting *In re Specht*, 622 F.3d 697, 701 (7th Cir. 2010); *see also Acosta v. City of Chicago*, No. 15 CV 8333, 2018 WL 3630011, at *2 n.4 (N.D. Ill. July 31, 2018) (unsealing medical records because they were relevant to the court's decision).

26(e)(1)(A), but it appears he was forthcoming regarding his then-current medical condition and was simply unaware that he was required to produce newly-obtained documents relating to his hernia to defense counsel.

The evidence in the summary judgment record shows that in February 2016, Dr. Marks diagnosed Cruz with a large non-fully reducible hernia. In August 2018, Dr. Okezie referred Cruz to a specialist, concluding that he was a candidate for hernia surgery because his hernia was "difficult to reduce." The specialist then diagnosed Cruz in October 2018 with three hernias that required laparoscopic and open surgery. And Cruz underwent surgery in January 2019. Defendants' contention that there is no "clinical indication that [Cruz] was a candidate for hernia surgery," and that Cruz "has never been told that his hernia is non-reducible," (Obaisi's Memorandum [86] at 4, 7-9; Williams' Memorandum [83] at 3-4, 9-10; Williams' Dec., Exhibit 4 to Williams' SOF [82] ¶ 42), is simply inconsistent with evidence that they either fail to acknowledge or ask the court to ignore. Cruz's *pro se* status does not excuse him from complying with applicable rules, *McNeil v. United States*, 508 U.S. 106, 113 (1993), but the court is unwilling to strike clearly relevant information, particularly in light of deposition testimony that should have alerted Defendants to the need for additional investigation of his claims. *See* 8B CHARLES ALAN WRIGHT, ARTHUR R. MILLER & RICHARD L. MARCUS, FEDERAL PRACTICE AND PROCEDURE § 2289.1 (3d ed. 1998) (noting that the advisory committee included exceptions to Rule 37's exclusion of evidence that was not properly supplemented to avoid unduly harsh automatic penalties). For these reasons, Defendants' motion to strike the "Medical Special Services Referral and Report" is denied.

## II.     Motion for Summary Judgment[6]

### A.     Facts

Having concluded that the "Medical Special Services Referral and Report" is admissible,

---

[6] The court will not consider legal conclusions from either side that are presented as facts. *See Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 381 n.2

the court has little difficulty concluding that disputes of fact preclude summary judgment in this case. The record shows that as early as 2009, Williams, a physician's assistant, diagnosed Cruz as suffering from what was then "a small and reducible left inguinal hernia." (Williams' SOF [82] ¶¶ 7, 28). According to Cruz, he felt the hernia progress "little by little" and brought it to Williams' attention again in 2014 or 2015. (Pl. Resp. to Williams' SOF [82] ¶ 10.) Cruz saw Dr. Obaisi in 2015, who diagnosed him with a small reducible left inguinal hernia and prescribed a hernia belt; Dr. Obaisi also was responsible for addressing Cruz's prostate issues. (Williams' SOF [82] ¶ 11; Obaisi's SOF [87] ¶¶ 11, 14, 48.)

Cruz understands that the medical staff relies on his complaints in order to properly evaluate and treat him. (Williams' SOF [82] ¶ 13; Obaisi's SOF [87] ¶¶ 13.) Although he had seen Williams on December 8, 2015 and had not at that time complained about the hernia, he sent a sick call request about it to Dr. Obaisi just six days later. (Exhibit 6 to Pl.'s Resp. Memorandum' [94].) Williams' motion for summary judgment asserts that when deposed, Cruz was unable to explain why he had not mentioned his hernia to her on December 8, 2015; in fact, he testified that the December 8 appointment was scheduled to address a different condition, that raising multiple conditions in a single medical visit was discouraged, and that he had requested an appointment with Dr. Obaisi because Williams did not alter her treatment when he previously complained about worsening pain. (Cruz Dep. [93] at 33:8-35:7.)

After Williams' initial diagnosis of his hernia, Cruz, in fact, had several further interactions with health care providers, including at least three appointments with Williams. (*See* Williams' SOF [82] ¶ 14; Cruz Dep. [93] at 29:1-7.) At an October 21, 2015 appointment, Cruz complained

---

(7th Cir. 2008) ("It is inappropriate to make legal arguments in a Rule 56.1 statement of facts."). The court also rejects the notion that Cruz's deposition testimony, which is based on his own experiences, should be discounted because it is "self-serving." (Obaisi's Memorandum [86] at 9-10; Williams' Memorandum [83] at 10.) *See Naveiar v. Iyiola*, 718 F.3d 692, 697 (7th Cir. 2013) ("We long ago buried—or at least tried to bury—the misconception that uncorroborated testimony from the non-movant cannot prevent summary judgment because it is self-serving.") (internal quotation marks and citation omitted)).

to Williams that the hernia belt was not alleviating the pulling sensation and that his pain was worsening. (Williams' SOF [82] ¶ 32.) On examination, Williams diagnosed "a moderate reducible left inguinal hernia that was tender to palpation," prescribed a fiber supplement twice a day for three months, educated him as to the proper use of his hernia belt, and told him to follow up as needed. (*Id*.) Cruz saw P.A. Williams again on November 20, 2015, for follow-up regarding his hernia and constipation. (*Id*. at ¶ 33.) According to Williams, she checked his hernia, which was still moderate in size and reducible; because Cruz did not complain that the hernia was painful or that his pain control was inadequate, she did not change his medication. (*Id*. at ¶¶ 33, 51.) Cruz testified, however that he "always" told Williams "the same thing; I got pain, I got pain in my hernia, I got pain, I got pain, it's swollen, it gets bigger, my testicles hurts, too." (Cruz Dep. [93] at 38:14-17.) On March 4, 2016, Williams again examined Cruz's hernia and concluded that it was still moderate and reducible and was neither incarcerated nor strangulated, so she prescribed Tylenol and continued his fiber prescription. (Williams' SOF [82] ¶ 35.)

Neither Dr. Obaisi nor Williams ever told Cruz that he needed to see a specialist for his hernia, and Williams never told Cruz that his hernia was strangulated, non-reducible, or increasing in size. (Williams' SOF [82] ¶¶ 15, 19-21; Obaisi's SOF [87] ¶ 16.) Williams repeatedly prescribed Tylenol and Fiber-Lax to treat Cruz's hernia, and asserts that she did not believe that any clinical indication justified a referral to Dr. Obaisi so he could evaluate Cruz's hernia. (Williams' SOF [82] ¶¶ 18, 25, 37, 46.) Cruz disagrees, explaining that he told Williams that he needed additional treatment "[b]ecause of my pain, my protruding, and it gets bigger and bigger, and having pain on my testicles." (Cruz Dep. [93] at 43:20-23.)

Urologist Constance Marks saw Cruz in February 2016 (and other times) in connection with Cruz's prostate condition. (Exhibit 5 to Pl.'s Resp. Memorandum [94].) On February 18, 2016, Dr. Marks diagnosed Cruz with a "large" inguinal hernia, "nontender but unable to fully reduce" and stated that her urology practice "does not treat hernias, but once he's undergone prostate biopsy, we can discuss referral/management of that as well." (*Id.*)

Dr. Obaisi saw Cruz repeatedly from May 2015 to February 2016. Cruz's medical records show that Dr. Obaisi addressed Cruz's hernia and prostate issues during the first visit and that the remaining visits concerned Cruz's prostate. (Obaisi's SOF [87] ¶¶ 49-67.) After Dr. Obaisi's death in December 2017, Dr. Funk (Wexford's Northern Illinois Regional Medical Director) reviewed Cruz's medical records. (*Id*. at ¶ 25.) Dr. Funk saw no indication that Dr. Obaisi ignored Cruz's complaints or withheld necessary medical treatment. (*Id*. at ¶¶ 28-29.) Cruz testified, in contrast, that during visits related to his prostate issues, he also complained repeatedly to Dr. Obaisi about his painful hernia, but that Dr. Obaisi "wouldn't want to hear it, he didn't want to have no records of it." As a result, Cruz contends, he was forced to submit a grievance asserting that Dr. Obaisi did not "write stuff down when [Cruz] talk[ed] to him about the hernia."[7] (Cruz Dep. [93] at 41:22-42:5.) Cruz also testified that Dr. Obaisi told him that after Cruz completed treatment for his testicular issues, they would "deal with that [the hernia]. Then I went in for a colonoscopy before he died, and he said, after the colonoscopy, we'll deal with that. Nothing. Nothing." (*Id*. at 51:8-12; *see also id*. at 30:16-22 ("Like I said, all the time when I talked to him, he just, we're not here to talk about that, we're not here to talk about that."); *id.* at 52:8-10 ("He told me that he was—after the colonoscopy, he would send me to see a specialist, but nothing happened, just promises.").) While Cruz believed that he needed to see a specialist because he thought the treatment he was receiving was inadequate, he also claims that he told both P.A. Williams and Dr. Obaisi that he believed he needed surgery because his hernia was growing increasingly painful. (*Id*. at 53:6-17, 54:15-19; 55:6-11.)

Cruz saw Dr. Okezie on August 15, 2018. (Pl.'s Resp. to Obaisi's SOF [93] at 56). In the

---

[7] The court has not taken an unescorted tour through the entirety of the approximately 1,000 pages of exhibits that Defendants submitted in support of their motions for summary judgment. Nevertheless, it notes that Cruz's deposition testimony is consistent with a grievance he submitted in June 2017 asserting that Dr. Obaisi refused to address his ongoing complaints about hernia pain; the grievance was denied because Cruz's medical records from the prior six months did not include any notes about his hernia. (Exhibit 5 to Williams' SOF [82] at 17-18.)

"Medical Special Services Referral and Report" described earlier, Dr. Okezie referred Cruz for a surgical consult due to a "large direct inguinal hernia that is difficult to reduce." (*Id.*) The doctor who subsequently evaluated Cruz found three hernias and recommended both laparoscopic and open surgery. (*Id.*) Cruz had hernia surgery on January 11, 2019. (*Id.* at ¶ 23.)

### B. Legal Standard

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the burden of proving the absence of such a dispute. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets that burden, the nonmoving party then bears the burden to demonstrate that there is a genuine dispute of material fact, "such that a reasonable jury could return a verdict in her favor." *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 773 (7th Cir. 2012). The burden on the nonmovant "is not onerous," *Liu v. T & H Mach., Inc.*, 191 F.3d 790, 796 (7th Cir. 1999), and the court "construe[s] all facts and reasonable inferences in favor of the nonmoving party." *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010). To defeat the motion, however, the non-moving party must be able to point to more than the "mere existence of a scintilla of evidence in support of" his position. *Liu*, 191 F.3d at 796.

### C. Cruz's Eighth Amendment Claims

Under the Eighth Amendment, correctional officials are liable "if they are deliberately indifferent to a prisoner's serious medical needs." *Harper v. Santos*, 847 F.3d 923, 927 (7th Cir. 2017) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). Defendants Williams and Obaisi suggest for the first time in reply that Cruz's hernia was not an objectively serious medical condition. (Williams' Reply [96] at 5; Obaisi's Reply [95] at 6.) Arguments raised for the first time in a summary judgment reply brief are waived. *Young Chul Kim v. Capital Dental Tech. Lab., Inc.*, 279 F. Supp. 3d 765, 774 n.9 (N.D. Ill. 2017) (citing *United States v. Turner*, 203 F.3d 1010,

11

1019 (7th Cir. 2000)). And the court would not be moved by this perfunctory argument even if it had been raised earlier. *Lauth v. Covance, Inc.*, 863 F.3d 708, 718 (7th Cir. 2017) ("'Perfunctory and undeveloped arguments are waived")'" (quoting *Campania Mgmt. Co. v. Rooks, Pitts & Poust*, 290 F.3d 843, 852 n.6 (7th Cir. 2002)). For the purposes of summary judgment, the court assumes that Cruz's inguinal hernia satisfies the objectively serious element.

The court thus turns to the subjective element (*i.e.*, whether any evidence suggests that P.A. Williams and Dr. Obaisi were deliberately indifferent).[8] Defendants correctly note that prisoners are not entitled to "unqualified access to healthcare," *Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012), nor to the "best care possible." *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011). Prison medical providers are not deliberately indifferent merely because they reject a prisoner's preferred treatment and instead provide a reasonable alternative. *Berry v. Peterman,* 604 F.3d 435, 441 (7th Cir. 2010). Moreover, neither medical malpractice, nor negligence, nor gross negligence suffice to show the requisite culpable state of mind for deliberate indifference. *See Cesal v. Moats*, 851 F.3d 714, 725 (7th Cir. 2017). Nevertheless, "[t]he receipt of some medical care does not automatically defeat a claim of deliberate indifference," which may have merit if a "prison official, having knowledge of a significant risk to inmate health or safety, administers blatantly inappropriate medical treatment, acts in a manner contrary to the recommendation of specialists, or delays a prisoner's treatment for non-medical reasons, thereby exacerbating his pain and suffering." *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015) (internal quotations and citations omitted).

As the Seventh Circuit itself has explained, there are three types of hernias: "(1) a hernia that is strangulated, which is a medical emergency mandating surgery; (2) a hernia that is

---

[8] The court clarifies that, to the extent that Cruz is attempting to hold Dr. Obaisi liable because he "was ultimately responsible for all medical care at Stateville Correctional Center," (Pl.'s Resp. Memorandum [94] at 9), such a claim may not proceed as there is no *respondeat superior* (*i.e.*, supervisory) liability under § 1983. *See, e.g.*, *Kinslow v. Pullara*, 538 F.3d 687, 692 (7th Cir. 2008).

reducible yet so painful or debilitating that surgery is required; and (3) a hernia that is reducible and, given the dangers and risks inherent in any operation, can be treated through non-surgical means." *Johnson v. Doughtry*, 433 F.3d 1001, 1014 (7th Cir. 2006). The parties do not explain where Cruz's non-fully reducible hernia (according to Dr. Marks and, later, Dr. Okezie) falls on this continuum, but "a hernia may become strangulated if it is not reducible, meaning that the hernia cannot be compressed back into the body." *Akers v. Wexford Health Sources, Inc.*, No. 14-CV-00997-JPG-DGW, 2015 WL 4574754, at *4 (S.D. Ill. July 29, 2015).

Defendants emphasize that they did evaluate Cruz and offered him treatment (Tylenol and fiber supplements from Williams and a hernia belt from Dr. Obaisi). The fact that "a plaintiff received 'some' treatment does not resolve the issue conclusively if the treatment was 'blatantly inappropriate,'" however. *Roe v. Elyea*, 631 F.3d 843, 858 (7th Cir. 2011) (emphasis omitted) (quoting *Greeno v. Daley*, 414 F.3d 645, 653-54 (7th Cir. 2005)). As of February 2016, Williams and Dr. Obaisi adhered to their diagnosis of a small reducible hernia despite Dr. Marks' belief that Cruz's hernia was large and not fully reducible. Dr. Marks apparently did not conclude that immediate surgery was necessary; she recommended a referral at an unspecified date after Cruz completed a test for his prostate condition. Her diagnosis and recommendation nevertheless calls into question the reasonableness of Williams' and Dr. Obaisi's diagnoses and their failure to make a referral (for P.A. Williams, a referral to Dr. Obaisi; for Dr. Obaisi, a referral to a hernia specialist). *See Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016) (en banc) (requiring "adequate, minimum-level care").

Defendants' contention that the care they furnished was constitutionally adequate is further undermined by Cruz's testimony that he repeatedly complained to Williams and Dr. Obaisi about worsening pain and told them that he believed his hernia was getting progressively larger. Cruz also points to Dr. Okezie's findings and recommendation in August 2018 and the hernia specialist's conclusion that he had three hernias that required surgery. Those hernias, Cruz argues, "did not grow overnight." (Pl.'s Resp. Memo. [94] at 5.) In essence, Cruz has identified

13

evidence that could support the inference that P.A. Williams and Dr. Obaisi turned a blind eye to Cruz's actual condition and unreasonably ignored his complaints of worsening pain.

The court recognizes the possibility that Cruz's condition in 2018 and early 2019, as diagnosed by Dr. Okezie, the specialist, and the surgeon who operated on Cruz, has no bearing on his condition at the time he was previously treated by Williams and Obaisi. The court draws no conclusion on this issue for now but is unwilling, on this record, to conclude that the care they provided meets the Eighth Amendment standard as a matter of law. Williams and Obaisi may genuinely and reasonably have believed that Cruz's hernia was small and fully reducible and that any complaints of pain he made were unfounded, but that is not the only inference that can be drawn.

Dr. Obaisi's argument that nothing in the record shows that he was aware of Dr. Marks' assessment of Cruz's hernia in early 2016 does not alter this conclusion. (Obaisi's Reply [95] at 7 ("[T]here is nothing in the record to indicate that [Dr. Marks] contacted Dr. Obaisi (or anyone from Stateville) to ensure that [Cruz's] condition was immediately addressed.").) A reasonable jury could conclude that: (1) Dr. Marks expected Dr. Obaisi—who was managing Cruz's prostate treatment, had referred Cruz to her, and had numerous appointments with Cruz regarding his prostate—to review her report and be aware of her findings; and (2) Dr. Obaisi's purported failure to do so was more than mere negligence given the circumstances. *See Petties*, 836 F.3d at 731 (observing that "the context surrounding a doctor's treatment decision can sometimes override his claimed ignorance of the risks stemming from that decision").

In sum, P.A. Williams and Dr. Obaisi's insistence that Cruz had a small and fully reducible hernia when they treated him and that he was never a candidate for surgical referral or surgical consultation does not entitle them to summary judgment. *See Gonzalez v. Feinerman*, 663 F.3d 311, 314 (7th Cir. 2011) (reversing dismissal of a claim based on medical providers' refusal to escalate management of a hernia that worsened over the course of seven years, and noting that medical literature suggests that "delay is recommended only for patients with minimal or no

symptoms, and then 'only if the hernia can be reduced readily and completely and will remain in position despite physical activity'") (quoting Andrew Kingsnorth, *Treating Inguinal Hernias*, 328 BRIT. MED. J. 59, 59 (2004)); *see also Webb v. Hamidullah*, 281 F. App'x 159, 167 (4th Cir. 2008) (holding that, "to defeat summary judgment on the delay issue, [Plaintiff] Webb was obligated to establish that the delay in his surgery caused him substantial harm—evidenced by, for example, a marked increase in his hernia's size, frequent complaints of severe pain, or signs that his hernia was becoming non-reducible or incarcerated"). Instead, when the court views the record in the light most favorable to Cruz, as it must at this stage, there is evidence that could support a finding that Defendants' decisions were "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment," *Rasho v. Eleya*, 856 F.3d 469, 476 (7th Cir. 2017) (quoting *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008)), and that Defendants' actions caused unnecessary delay that caused his condition to worsen. *Williams v. Liefer*, 491 F.3d 710, 715-16 (7th Cir. 2007).

## **CONCLUSION**

Defendants' motions for summary judgment [78, 80] are denied. Their motion for leave to file Cruz's medical records under seal [74] is granted in part and denied in part. This case is set for telephone status conference on May 30, 2018 at 8:30 a.m., the call to be initiated by defense counsel from their offices.

ENTER:

Dated: May 14, 2019

REBECCA R. PALLMEYER
United States District Judge